First Church of Christ, Scientist v. Browning 















IN THE
TENTH COURT OF APPEALS
 

No. 10-95-204-CV

     FIRST CHURCH OF CHRIST, SCIENTIST,
                                                                                              Appellant
     v.

     JOHN S. BROWNING, INDIVIDUALLY AND
     AS ADMINISTRATOR OF THE ESTATE OF
     JOHN H. BROWNING AND MARY ANN STEPHENSON,                                                                                                               Appellee 
 

From the County Court
McLennan County, Texas
Trial Court # 940324 PR1
                                                                                                    

O P I N I O N
                                                                                                    

      The First Church of Christ, Scientist (the Church) appeals from a summary judgment granted
in favor of John S. Browning in this will contest case and asserts that questions of fact preclude
the summary judgment. We agree with the Church and will reverse and remand.
      John H. Browning (Decedent) was found dead in a Waco motel room on June 11, 1994, at
the age of eighty-five. Justice of the Peace John Cabaniss was called to the scene. While there,
he reviewed a will executed by Decedent that was among Decedent's personal effects. After
investigation, all of Decedent's personal effects were delivered to the Waco Police Department and
placed in the property room. Later, the police department delivered Decedent's personal effects
found in the motel room to Decedent's son, John S. Browning (Browning). Browning, however,
denies that an original will was among the property he received from the police. 
      Browning applied for Letters of Independent Administration Without Bond on June 13, and
represented to the court that Decedent had died intestate with only himself and his sister, Mary
Ann Stephenson, surviving. On August 31, the Church filed its Application for Probate of Will
and Issuance of Letters Testamentary or Alternatively for Letters of Administration With Will
Annexed. The Church supplied the court with a photocopy of a self-proved will and alleged that
the original cannot be produced because "applicant believes the original will to have been
delivered after the death of decedent to the Waco Police Department which delivered the original
to John S. Browning and the whereabouts of said will is unknown to applicant." The will, drafted
by the Dunham law firm, was executed by Decedent on May 28, 1981, bequeathed five dollars
to each of his two children, and bequeathed the rest, residue and remainder of his estate to the
Church. Acting on his and his sister's behalf, Browning contested the probate of the photocopied
will, alleging that the "Church has not, as a matter of law, established the requirements of the
Probate Code of the State of Texas including but not limited to Section 81 of the Probate Code." 
      After extensive discovery, Browning moved for a summary judgment denying the photocopied
will's admission to probate. Browning contended in the motion that, because no original will was
found, produced, or filed, the presumption of revocation arose and was not rebutted by the
Church. Following a hearing, the court granted Browning's motion for a summary judgment and
ordered that the Church take nothing. 
STANDARD OF REVIEW
      A party is entitled to summary judgment if he can demonstrate that there is no genuine issue
of material fact. Nixon v. Mr. Property Management, 690 S.W.2d 546, 548-49 (Tex. 1985). 
Evidence favorable to the non-movant is taken as true; all reasonable inferences are indulged in
favor of the non-movant, and any doubts are resolved in his favor. Id.
DISCUSSION
      Browning's motion for a summary judgment asserts that the summary-judgment evidence
"establish[es], without controversy, and without any issue of fact being raised," that: 
      a.   No original, written will of Decedent has been filed or produced;
      b.   No original, written will of Decedent was found among his effects or elsewhere upon his
death;
      c.   No original, written will of Decedent having been found among his effects or produced
after his death, a legal presumption arises that the alleged will had been revoked by
decedent prior to his death; and 
      d.   The legal presumption of revocation has not been rebutted or overcome, and cannot be
rebutted or overcome by evidence.
      However, Judge Cabaniss, who is also an attorney, testified in his deposition about the will
that was found and that he inspected in the Decedent's motel room on June 11, 1994. The
following excerpt of Judge Cabaniss' deposition testimony was attached as summary-judgment
evidence:
      Q:  The will that you saw, do you—do you recall whether it was a copy or whether it was an
original?
      A:  It was an original.
      Q:  I'll hand you what's been marked Cabaniss Exhibit Number 1, and ask you if you can
identify that instrument?
      A:  Well, I don't know whether I can or not, Frank, because—this is a will, I can see that it's
a copy of one. Now, bear in mind that even though I'm an attorney, what I was looking
for was trying to find an address of the old gentleman; so the thing I looked at is—I did
look, of course, at the very first of the will and looked through it, and it was an original
will. It was, from everything I could see looking at it, a probatable will, because it was
an original.
      Judge Cabaniss testified that he observed that the will had been drafted by an attorney at the
Dunham law firm in Waco, and that he contacted the firm to inform them of Decedent's death and
of the will he had seen. Vance Dunham, Jr., a member of the firm, was deposed and testified as
follows:
      Q:  Okay. I'll ask you this, Vance: Did you find an original will of John Hubbard
Browning?
      A:  No. No.
      Q:  Did you find what appeared to be a copy, a photocopy of a will?
      A:  Yes. I had a copy. We keep a copy of every will that we execute.
. . . 
      Q:  Okay. Do you have any independent knowledge that Mr. John Hubbard Browning did
or did not revoke the original of a will dated May 28, 1981 by executing a later dated
will?
      A:  We did not draw any other will for Mr. Browning. This is the only will that we ever
prepared for him. I have no knowledge as to whether or not this will was revoked or not
revoked. 
      Considering the summary-judgment evidence in the light most favorable to the Church, the
non-movant, a fact-finder could believe Judge Cabaniss' testimony that he saw an original will
after Decedent's death and Dunham's testimony that his firm only prepared one will for Decedent. 
Taking the foregoing as true—as we must in a summary-judgment case—the presumption of
revocation is inapplicable because there was evidence that an original will was seen following
Decedent's death. Hoppe v. Hoppe, 703 S.W.2d 224, 226 (Tex. App.—Houston [14th Dist.]
1985, writ ref'd n.r.e.). Additionally, a reasonable inference arises—that also must be indulged
in favor of the Church—that the photocopy of the will offered for probate is a copy of the
unrevoked original will that Judge Cabaniss saw after Decedent's death. The result of the
foregoing testimony and inferences, taken as true, would allow the probate of the photocopied
will. Tex. Prob. Code Ann. § 81 (Vernon 1980 & Supp. 1995). Therefore, the summary-judgment evidence raises questions of fact, and the summary judgment was improperly granted. 
Point of error one is sustained. Due to the disposition of point one, we do not reach the Church's
second point. 
      The case is reversed and remanded for a trial. 
 
BOB L. THOMAS
Chief Justice
Before Chief Justice Thomas,
      Justice Cummings, and
      Justice Vance
Reversed and Remanded
Opinion delivered and filed December 6, 1995
Do not publish 



RRED IN ALLOWING A POLICE OFFICER TO TESTIFY
AS A BLOOD SPLATTER EXPERT WHERE THERE WAS LITTLE TESTIMONY
CONCERNING HIS QUALIFICATIONS, AND THERE WAS NO TESTIMONY
CONCERNING THE RELIABILITY OF BLOOD SPLATTER INTERPRETATION.

At this point, it appears Holmes is attacking the qualifications of the expert and launches a
global attack on the reliability of blood spatter analysis, thus invoking a review of all three
criteria of Kelly, the third one being that the technique must have been properly applied on the
occasion in question. See Kelly v. State, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992). But
in the body of his argument, Holmes argues that (1) because January was not qualified as an
expert, the State did not establish the scientific validity of blood spatter analysis, thus raising a
complaint of only the first criteria of Kelly; (2) January was not qualified as an expert in blood
spatter analysis, qualification being a separate issue under a rule 702 analysis; and (3) Holmes
was harmed by January’s testimony.
      Holmes provides no specific argument or analysis as to whether the technique was
properly applied on the occasion in question. He simply argues validity and qualifications. 
This does not get him a review of the application criteria. A party can have the world’s
foremost authority testify and establish the validity of the scientific field, but if the technique is
improperly applied, the testimony is not reliable. It is not a question of the witness’s
qualification as an expert, although that can be a factor in the analysis; it is a question of the
expert’s application of the underlying science on the occasion in question. Thus, based on
Holmes’s brief, we will address whether the testifying expert was qualified, whether the
theory/field of blood spatter analysis is valid (the first Kelly criteria), whether the technique
applying the theory is valid (scope within field–the second Kelly criteria), and, if necessary,
whether Holmes was harmed by the admitted testimony.
Qualification
      To qualify as an expert witness, the witness must possess special knowledge of the specific
matter about which the expertise is sought. Cortijo v. State, 739 S.W.2d 486, 488 (Tex.
App.—Corpus Christi 1987, pet. ref’d). The special knowledge that qualifies a witness to give
an expert opinion may be derived from specialized education, practical experience, a study of
technical works, or a varying combination of these things. Wyatt v. State, 23 S.W.3d 18, 27
(Tex. Crim. App. 2000)(quoting Penry v. State, 903 S.W.2d 715, 762 (Tex. Crim. App.
1995)); see Tex. R. Evid. 702. An expert witness’s knowledge or experience about an issue
must only exceed that of an average juror. Gonzales v. State, 4 S.W.3d 406, 417 (Tex.
App.—Waco 1999, no pet.).
      Whether a witness presented qualifies as an expert is a question that rests largely in the
trial court’s discretion. Wyatt, 23 S.W.3d at 27; Gonzales, 4 S.W.3d at 417. Absent a clear
abuse of discretion, the trial court’s decision to admit or exclude the testimony will not be
disturbed. Wyatt, 23 S.W.3d at 27; Cortijo, 739 S.W.2d at 488.
      The Court of Criminal Appeals has previously found no abuse of discretion in qualifying a
witness as an expert in blood spatter analysis where the witness had received more than 60
hours of training, had read a book on the subject, and contended that the methods used were of
the type relied on by experts in the field. Alvarado v. State, 912 S.W.2d 199, 215-216 (Tex.
Crim. App. 1995).
Evidence
      Regarding his qualifications, January testified that he had been employed with the Waco
Police Department for 13 years. His current assignment was as a detective for the special
crimes unit. January stated he had been a detective in that unit for six and a half years. As a
detective for the special crimes unit, January was responsible for conducting follow-up
investigations on major crimes that occur against persons.
      January also testified that he had received Level 1 training in blood spatter analysis. He
explained that there are two levels of training and that Level 1 training included the recognition
of blood patterns and blood spatter that is caused by some type of blood source at the scene. 
The Level 1 training session was one-week long and taught at the DPS academy in Austin. 
January estimated that he actually participated in 45-50 hours of instruction. The instructor,
Bob Henderson, was a nationally known blood spatter expert. Henderson studied under Tom
Bevel, another world renowned blood spatter expert.
      In the class, January studied blood velocities, blood patterns, blood sources, and weapons.
January explained that the size of the blood drop, the blood stain, or the blood pattern is
determined by several different variables such as what struck the blood source. He further
explained that a projectile from a weapon would cause a fine mist of blood to hit whatever
surface it strikes. He stated that a medium velocity weapon would be something like a club
and a low velocity weapon would be something like a fist.
      January also studied the results of when weapons touch a blood source and then create a
“cast-off” pattern. He explained that a cast-off pattern is created when an object, like a knife,
contacts a blood source and, when removed from the blood source, distributes the blood that
was on it to another surface such as a wall. This creates a different pattern than if someone
was standing and dripping blood on a surface.
      January stated that in the class, he applied the principles taught by participating in
demonstrations of blood spatter in rooms covered in butcher paper. Using different types of
weapons which included guns, knives, and clubs, January and his classmates hit different types
of objects that were soaked with blood so they could study the different patterns. He testified
that he based his interpretations on the case studies and experience from the school and on
crime scenes.
      In response to a question by the trial court, January testified that he has had the 
opportunity to use the techniques and apply the analysis he learned at the school in his
investigations of crime scenes. January also told the court that he would use the principles he
learned while looking at photographs and testifying before the jury about how blood could be
transferred to an item or object. January explained for the court the significance of the shape
of blood drops in a photograph of the crime scene presented by the State.
      January testified that, in addition to hands on experience, he read books on blood spatter
analysis that were written by other experts using the same theories. It was his understanding
that the application of blood spatter analysis had been verified by other experts in the field.
Conclusion
      We discern no difference between the experts’s qualifications on blood spatter analysis in
Alvarado and January’s qualifications. Thus, the trial court did not abuse its discretion in
finding January qualified to testify as an expert. Holmes’s issue regarding January’s
qualification as an expert is overruled
Reliability
      Again, we reach a stumbling block on Holmes’ second presented issue; that being,
preservation. On five occasions, Holmes objected to or discussed January’s qualifications to
testify as an expert in blood spatter analysis. As January began to explain blood spatters in a
photograph, Holmes’s attorney objected. The objections and statements counsel made were as
follows:
Objection, Your Honor. Until it is shown that Detective January has technical and
scientific training and knowledge to testify to an opinion—

****
 
Daubert-Robinson and the Code of Criminal Procedure concerning testimony of
expert witnesses – ... one, Your Honor, and further request a Daubert-Robinson
hearing concerning qualifications on Detective January as an expert.

The trial court agreed to hold a hearing outside the presence of the jury. Prior to the start of
testimony for the hearing, counsel stated:
Actually, if I’m being asked to talk about his qualifications, I think the burden is on
the State to show that the man is qualified to testified (sic) as opposed to me.

***
 
...as I understand, the State has the burden of showing the witness is qualified to
testify as an expert, and so I’m asking the State to present testimony.

Then, at the conclusion of the hearing, counsel argued:
Again, Your Honor, I renew my objection. Obviously as to the testimony of that one
photograph that we were talking about, I’d like to have that testimony in, but I don’t
know what other photographs are going to be discussed and what the testimony is
going to be there, and I do not believe that Detective January has been shown to be
qualified under Rule 702 by knowledge, skill, experience, training or education to
testify as to the causation of how blood was transferred from one source to another,
and we would move to strike – or move to limit his testimony to that of personal
observation as opposed to opinion testimony of the expert.

The objection was overruled. The hearing outside the presence of the jury was predicated
solely on Holmes’s complaint that January was not qualified as an expert regarding blood
spatter analysis. It is clear from the passages in the record that Holmes was not challenging
the reliability of the theory of blood spatter analysis.
      It was not until after the hearing and for the purpose of stating an objection on the record
before the jury that Holmes, for the first time, suggested a complaint about the reliability of the
field of blood spatter analysis. His objection is as follows:
Your Honor, if we are still at the photograph which I believe was State’s exhibit 8,
prior to Detective January testifying as to blood spatter analysis, I would again renew
my objection under Rule 702 of the Rules of Evidence to the qualifications of
Detective January as an expert in the area of blood spatter analysis in that there is no
showing of the validity of the science of blood splatter, there has been no showing of
the validity of the technique of blood splatter employed, and there has been no
showing of technique being properly applied on the occasion in question prior to us
coming on the record in front of the jury, and I’m referring to the hearing outside the
presence, Your Honor. (emphasis added).

Because the objection regarding the reliability of the field was obscured by the repetition of
five challenges to January’s qualifications, one of which resulted in a hearing outside the
presence of the jury, and because the purported purpose of the “sixth” objection was to simply
get that objection on the record before the jury, it is not clear that anyone understood that this
was not the same objection simply being restated in front of the jury and went to an entirely
different complaint about the testimony January was about to give.
      Objections promote the prevention and correction of errors. Aldrich v. State, 104 S.W.3d
890, 894 (Tex. Crim. App. 2003). And we should require very specific objections to attack
the basis of expert testimony. See Tex. R. Evid. 702. The objection should be sufficient to
inform the trial court and the proponent of the evidence of the alleged defect in the foundation
for the admission of expert testimony. But a sufficient objection to expert testimony should not
be buried or obscured by numerous objections to other defects. Compare Tex. R. Civ. P. 274. 
“Shotgun” objections, which cite many grounds for the objection without argument and serve
only to obscure the specific grounds of the objection, do not preserve a complaint for appellate
review. Webb v. State, 899 S.W.2d 814, 818 (Tex. App.—Waco 1995, pet. ref’d); Berry v.
State, 813 S.W.2d 636, 639 (Tex. App.—Houston [14th Dist.]1991, pet. ref’d). If Holmes’s
intent was to challenge the reliability of blood spatter analysis and put the State to the task of
proving each of the three Kelly criteria, his intent was obscured by the continuous objections to
January’s qualifications. He should not benefit from the obscurity. Although we have grave
doubts that this complaint is properly preserved for review, we will, nevertheless, address the
issue.
      Law
      To be considered reliable, evidence derived from a scientific theory must satisfy three
criteria: (1) the underlying scientific theory must be valid; (2) the technique applying the
theory must be valid; and (3) the technique must have been properly applied on the occasion in
question. Kelly v. State, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992). This three-criteria
test is not limited to novel scientific evidence; it applies to all scientific evidence. Hartman v.
State, 946 S.W.2d 60, 63 (Tex. Crim. App. 1997). The proponent of the scientific evidence
has the burden to prove its reliability by clear and convincing evidence. Kelly, 824 S.W.2d at
573.
      But a party seeking to introduce evidence of a scientific principle need not always present
expert testimony, treatises, or other scientific material to satisfy the first two criteria of the
Kelly test. Hernandez v. State, 116 S.W.3d 26, 28-29 ( Tex. Crim. App. 2003). It is only at
the dawn of judicial consideration of a particular type of forensic scientific evidence that trial
courts must conduct full-blown "gatekeeping" hearings under Kelly. Id. at 29. Trial courts are
not required to re-invent the scientific wheel in every trial. Id. Some court, somewhere, has
to conduct an adversarial gatekeeping hearing to determine the reliability of the given scientific
theory and its methodology. Id. There is no "bright line" judicial rule for when a scientific
theory or technique becomes so widely accepted or persuasively proven that future courts may
take judicial notice of its reliability. Id. at n. 6. However, if the Court of Criminal Appeals,
this Court, or another Texas appellate court has already determined the validity of a particular
scientific theory or technique, then the party offering the expert testimony need not satisfy
Kelly’s first two criteria. See id. at 27. The trial court and a reviewing court can rely upon
prior opinions and take judicial notice of those findings. See id. at 31, n. 12.
      Texas Cases
      Generally, blood spatter experts inspect the physical evidence to determine the injuries
suffered and their location with respect to the other physical evidence. Ex Parte Mowbray,
943 S.W.2d 461, 462 (Tex. Crim. App. 1996). Texas appellate courts have reviewed trials
which included blood spatter testimony since the early 1980's when the intermediate appellate
courts acquired criminal jurisdiction. See Stanley v. State, 664 S.W.2d 746, 749 (Tex.
App.—San Antonio 1983, pet. ref’d) (County medical examiner used blood spatter to conclude
victim was probably lying down when shot). The Court of Criminal Appeals has been
reviewing this kind of evidence for a much longer period of time, since at least 1921. See
Pounds v. State, 230 S.W. 683, 685 & 690 (Tex. Crim. App. 1921) (Court wondered “with
the quantity of blood spattered upon the fence and the water trough, how it could occur that if
the spatters of blood were caused by a single kick from the jack, or more than one, that some
spatters of blood were not found upon the legs or other portions of the jack's body.”).
      Since then there have been a plethora of cases in Texas involving the use of blood spatter
analysis. Not all have reviewed challenges to the reliability of expert testimony.


 Some have
had the opportunity to conduct such a review but opted instead to conduct a harm analysis and
found the admission of the testimony harmless. See Franklin v. State, No. 01-02-118-CR,
2003 Tex. App. Lexis 2575 (Houston [1st Dist.] March 27, 2003, no pet.)(not designated for
publication); Hall v. State, 970 S.W.2d 137 (Tex. App.—Amarillo 1998, pet. ref’d).
      The El Paso Court considered the admission of blood spatter testimony in 2000. See
Franco v. State, 25 S.W.3d 26 (Tex. App.—El Paso 2000, pet. ref’d). The defendant was
convicted of murder and sentenced to 99 years in prison. On appeal, the defendant argued that
the trial court erred in admitting expert testimony concerning blood spatter analysis without
either conducting a hearing outside the presence of the jury or requiring the State to show by
clear and convincing evidence that the blood spatter evidence was relevant and reliable. Id. at
29. A majority of the El Paso Court determined that the State conceded error but argued that
the admission of the blood spatter evidence was harmless because such evidence had been
admissible as scientific evidence since 1987. Id. 
      In dicta, the court mused:
We can envision circumstances where the trier of fact may be quite properly aided by
some evidence of blood splatter analysis, but we are dubious of the claim in this
record that blood spatter evidence can ‘determine the aftermath of a violent incident of
bloodshed and to try to determine the location of individuals before, during and after
bloodshed and to try to determine, perhaps, a sequence of events that occurred based
upon the bloodstain evidence available at the scene.’

Id. The court further surmised that even if blood spatter analysis was scientifically valid, it
may be unhelpful for some other reason. Id. The court could find “nothing in the blood
spatter analysis from which any ‘expert’ could draw an opinion as to who was (or who was
not) the initial aggressor, an opinion repeatedly made and emphasized in this case.” Id. at 30.
That would have been an appropriate case, on proper objection, for the trial court to determine
if the theory had been properly applied on the specific occasion. But without specifically
holding that the admission of the testimony was error, presumably because the majority
believed the State conceded error, the court went on to conduct a harm analysis and held that
the admission of the testimony was harmless. Id. at 31.
      As early as 1987, the First Court of Appeals in Houston and the Corpus Christi Court
reviewed challenges to expert testimony in blood spatter analysis and held the testimony to be
admissible. See Lewis v. State, 737 S.W.2d 857, 861 (Tex. App.—Houston [1st Dist.] 1987,
pet. ref’d); Cortijo v. State, 739 S.W.2d 486, 489 (Tex. App.—Corpus Christi 1987, pet.
ref’d). In a post Daubert/Kelly opinion, the Court of Criminal Appeals found testimony about
blood spatter analysis admissible in light of a Rule 702 challenge. Alvarado v. State, 912
S.W.2d 199, 215-216 (Tex. Crim. App. 1995). It appears, however, that only the First Court
reviewed extensive testimony about the expert’s qualifications and the reliability of the field of
blood spatter analysis. The First Court also took judicial notice that courts around the country
had considered blood spatter analysis a proper subject for expert testimony. See Lewis, 737
S.W.2d at 860 (citing State v. Melson, 638 S.W.2d 342 (Tenn. 1982); State v. Hilton, 431
A.2d 1296 (Me. 1981); People v. Erickson, 411 N.E.2d 44 (Ill. 1980); People v. Carter, 312
P.2d 665 (Cal. 1957)).
      In Lewis, the expert, Herbert MacDonnell,


 testified that he (1) was a criminologist; (2)
had degrees in physics and chemistry; (3) had been employed as a chemistry professor and an
industrial chemist; (4) had studied blood stain characteristics since 1954; (5) had performed
thousands of lab experiments; (6) had studied under a well-known criminologist; and (7) had
testified in 26 states on blood spatter. Lewis, 737 S.W.2d at 860. The trial court further heard
that the field of blood spatter analysis was not particularly novel, as blood acts as any other
liquid when dropped, smeared or spattered. Id. And blood analysis borrows techniques from
chemistry, physics, math, and biology. Id. MacDonnell also testified that he was aware of
many others who studied in this field. Id. at 861. Based on this testimony, the First Court
determined that “MacDonnell's studies are based on general principles of physics, chemistry,
biology, and mathematics, and his methods use tools as widely recognized as the microscope;
his techniques are neither untested nor unreliable. We hold that MacDonnell's testimony was
properly admitted.” Id.
      As recently as last March, the First Court acknowledged its long-standing recognition of
the validity of blood spatter analysis. See Franklin v. State, No. 01-02-00118-CR, 2003 Tex.
App. Lexis 2575, *14 (Houston [1st Dist.] March 27, 2003, no pet.)(not designated for
publication).
      In Alvarado, the defendant argued to the Court of Criminal Appeals that the admission of
testimony about blood spatter analysis violated Texas Rule of Criminal Evidence 702


 because
the officer testifying was not qualified as an expert in any recognized discipline. Alvarado,
912 S.W.2d at 215. Before the trial court decided to admit the officer’s testimony, the officer
stated that:
bloodstain pattern interpretation involved the visual examination of bloodstains on
various types of surfaces for the purpose of determining how the bloodstains were
deposited; bloodstain pattern interpretation was based on general principles of physics
and mathematics; he had received more than 60 hours of training in the subject from
the Houston and El Paso police departments; he had read a book on the subject; and
the methods he used in his interpretation of bloodstains were of the type relied upon
by experts in the field.

Id. After a general analysis under Rule 702, the Court held that the trial court did not abuse its
discretion in admitting the testimony because, on the record before the trial court, the trial
court could have reasonably found that: (1) the officer, because of his training, was qualified
as an expert on blood spatter analysis; (2) lay persons were not qualified to the best possible
degree to interpret blood spatter and, therefore, expert testimony on the subject was generally
appropriate; and (3) the officer’s specialized knowledge would actually assist the jury in the
defendant’s case in determining his guilt or innocence. Id. at 216.
      Thus, according to the majority opinion in Hernandez, the trial court could, and we can,
take judicial notice of Lewis, and possibly Alvarado, and use those opinions as support for the
first two criteria of Kelly. See Hernandez v. State, 116 S.W.3d 26, 27 and 31, n. 12 (Tex.
Crim. App. 2003).
      But the majority in Hernandez noted that judicial notice cannot serve as the sole source of
support for a bare trial record concerning scientific reliability. Id. at 31-32. The record in this
case is not bare as was the record in Hernandez. Whereas the expert in Hernandez could not
testify about the theories and techniques surrounding the ADx machine, January testified about
the theory and techniques of blood spatter analysis.
      Alternative
      Even if we cannot rely solely on Lewis and Alvarado, Presiding Judge Keller has provided
us with a more definitive approach to determining when we can take judicial notice of the
reliability of a scientific theory or technique. Hernandez v. State, 116 S.W.3d 26, 32-42 (Tex.
Crim. App. 2003)(Keller, P.J., concurring). Under the alternative analysis, the reliability of a
scientific theory or technique can be judicially noticed in three ways: (1) when it is a matter of
common knowledge, (2) when widely available court decisions show that reliability has been
litigated elsewhere in fact-finding forums to a degree sufficient for the appellate court to
conclude that reliability is well-established, and (3) when a prior determination of reliability
has been made by an appellate court whose pronouncements are binding in the jurisdiction. Id.
at 32.
      Other jurisdictions across the country have discussed the admissibility of blood spatter
evidence. We will review these out-of-state opinions, as well as the Texas opinions, in light of
the criteria for judicial notice as described in the concurring opinion in Hernandez. Hernandez
v. State, 116 S.W.3d 26, 32-42 (Tex. Crim. App. 2003)(Keller, P.J., concurring).
            (1) Common Knowledge
      Some scientific theories and techniques are so well known that they are matters of common
knowledge and judicial notice may be taken without a fact finding hearing and without
consulting any scientific literature. Id. at 34-35. Examples of theories and techniques that are
now a matter of common knowledge include the laws of thermodynamics and the uniqueness of
fingerprints and DNA. Id. at 35.
      Experts have testified that blood spatter analysis is based on the general principles of
chemistry, physics, biology, and mathematics. See e.g. Alvarado v. State, 912 S.W.2d 199,
215 (Tex. Crim. App. 1995); Lewis v. State, 737 S.W.2d 857, 860 (Tex. App.—Houston [1st
Dist.] 1987, pet. ref’d). At least two courts have determined blood spatter analysis to be a
matter of common knowledge.
      In State v. Hall, the Iowa Supreme Court began its analysis with determining that the Frye



test of “general scientific acceptance” was not a prerequisite to the admission of evidence if the
reliability of the evidence is otherwise established. State v. Hall, 297 N.W.2d 80, 85 (Iowa
Sup. 1980). In Hall, the evidence offered to show the reliability of blood spatter analysis
included:
(1) the witness’s considerable experience and his status as the leading expert in the
field; (2) the existence of national training programs; (3) the existence of national and
state organizations for experts in the field; (4) the offering of courses on the subject in
several major schools; (5) use by police departments throughout the country in their
day-to-day operations; (6) the holding of annual seminars; and (7) the existence of
specialized publications. 

Id. Compared to other scientific techniques, the Iowa Court found the study of blood
characteristics to be relatively uncomplicated. Id. at 86. It also did not see a distinction
between this technique and other areas of expert testimony that is readily received, such as
ballistics, fingerprints, and blood types. Id. The Court then concluded that the foundation
evidence of reliability and the inherent understandability of blood spatter analysis provided a
sufficient basis for its admission. Id.
      In People v. Clark, the defendant argued that testimony regarding blood spatter analysis
did not meet the criteria of the Frye test. People v. Clark, 857 P.2d 1099, 1142 (Cal. 1993).
The California Supreme Court determined that the testimony raised none of the concerns
addressed by Frye. Id. It further determined that "The methods employed are not new to
[science] or the law, and they carry no misleading aura of scientific infallibility." Id. (citing
People v. Stoll, 783 P.2d 698 (Cal. 1989)). The Court concluded that blood spatter analysis is
a matter of common knowledge, readily understood by the jury, that blood will be expelled
from the human body if it is hit with sufficient force, and that inferences can be drawn from
the manner in which the expelled blood lands upon other objects. Id.
            (2) Consideration in other Courts
      Under the second manner which judicial notice may be taken, if the trial court in the case
under consideration on appeal did not conduct an extensive evidentiary hearing, that trial court
or an appellate court reviewing the case can use the decisions of other appellate courts that had
the benefit of an extensive reliability hearing held at trial. Hernandez v. State, 116 S.W.3d 26,
35 (Tex. Crim. App. 2003)(Keller, P.J., concurring). But a less exacting inquiry should be
required if a large number of jurisdictions recognize the validity or reliability of a scientific
theory or technique. Id. at 37. A court could take judicial notice based upon the great weight
of authority. Id.
      In addition to the First Court’s opinion in Lewis, the courts of other states have reviewed
or conducted extensive reliability hearings on the validity of blood spatter analysis. In 1983,
the Oklahoma Court of Criminal Appeals reviewed such a hearing. See Farris v. State, 670
P.2d 995 (Okla. Cr. 1983). In Farris, the defendant argued on appeal that testimony of blood
spatter analysis at the scene of the crime was reversible error because that analysis was not a
recognized forensic science. Id. at 997. The Court noted:
The geometric Blood Stain Interpretation is a method used to reconstruct the scene of
the crime. Blood stains are uniform in character and conform to the laws of inertia,
centrifugal force and physics. Study of the blood pattern along with its size and shape
helps determine the source of the blood and any movement that might have occurred
after the bloodshed began, including subsequent violent attacks upon the victim. 

Id. The defendant challenged the reliability of the technique and its acceptance in the scientific
community. The trial court held an in-camera hearing. At that hearing, the trial court found
that geometric blood stain interpretation is a forensic science which is recognized by the
Federal Bureau of Investigation, New Scotland Yard, and the Oklahoma Bureau of
Investigation. Id. The court also found that the manual on the subject, published by the
Department of Justice, was entitled FLIGHT CHARACTERISTICS AND STAIN PATTERNS
OF HUMAN BLOOD. Id. After a review of the hearing, the Oklahoma Court of Criminal
Appeals held that the trial court properly admitted the expert witness testimony. Id. at 998. 
Many years later, the Oklahoma Court continued to recognize the propriety of expert testimony
on blood spatter analysis. See Romano v. State, 909 P.2d 92, 111-112 (Okla. Cr. 1995).
      The North Carolina Supreme Court has also accepted blood spatter analysis as a valid
scientific technique. See State v. Goode, 461 S.E.2d 631 (N.C. 1995). In Goode, the
defendant contended that blood spatter analysis was not an appropriate area for expert
testimony because it had not been established as scientifically reliable. Id. at 641. The North
Carolina Supreme Court observed that the expert witness, a forensic serologist, testified
extensively on voir dire concerning the reliability of blood spatter analysis. Id. The witness
testified:
...that bloodstain pattern interpretation is a "specialized crime scene technique"
wherein a specially trained individual studies the blood and the types of stains at the
scene of the crime, and then, based upon his knowledge of similar bloodstain
characteristics and reproductions of the crime scene, he forms an opinion about "what
actually occurred [at] the crime scene." In order to determine what occurred at the
crime scene using this method of proof, experts rely upon specific categories of
bloodstains which are defined by the way in which they are made. These categories
can be established through observation and reconstruction, as similar stains are
produced under similar circumstances.

Id. After reviewing the witness’s testimony, the North Carolina Supreme Court concluded that
blood spatter analysis was an appropriate area for expert testimony. Id. The Court also
supported its conclusion by recognizing that it had implicitly accepted blood spatter analysis as
a scientific method of proof in another case and that appellate courts in other jurisdictions had
done the same. Id. at 641-642.
      In State v. Melson, the expert testimony was sought to explain the pattern of blood stains
which were spread over the defendant's shirt and pants, from top to bottom, as well as to some
extent on his cap and boots. State v. Melson, 638 S.W.2d 342, 363 (Tenn. 1982). The
defendant objected to the recognition of this area of expertise in Tennessee. Id. The expert
testified that he had participated in the investigations of many crimes, published many writings,
conducted numerous seminars, and conducted research over a long period of years in forensic
science in general and, in particular, the principles of physics as applied to blood patterns. Id.
The defense argued that none of the expert’s experiments in blood pattern analysis had been
carried out on humans, but only on animals. Id. However, the Tennessee Supreme Court
noted that the crimes which the expert had investigated involved humans. Further, the Court
observed that the expert testified that "in physics it makes very little difference as to what the
origin of the blood is -- whether it is polyurethane soaked with blood or it is a human hand -- it
really doesn't matter. You transfer energy to blood hydrostatically and you get an eruption of
blood spatters." Id. at 364.
      The defense also urged that there was no such area of expertise as "blood stain patterns."
But the Supreme Court was satisfied with the validity of the field, stating:
[A]lthough a field may be narrow, there may certainly be persons who are experts
therein. Certainly there are fewer experts in, for example, nuclear physics than there
are in fingerprint identification, but the narrowness of a field should not preclude the
testimony of one who has proved his expertise therein to the satisfaction of the trial
court in the reasonable exercise of his discretion. In any case, the witness testified that
he had trained over 300 people in the area; and that there were others (including the
defense's chosen expert) who were also training people. The subject has been written
on as far back as 1898, and the witness knew of over a hundred reference works. As
the witness said, "there are other people who testify [as blood pattern experts]. I am
one of the few and I certainly wouldn't say that there are a large number, but there is
an ever increasing number." 

Id. The Court then found that the expert’s testimony was clear, understandable, and
accompanied by demonstrations to the jury. Id. And it was obvious to the Court he knew
about what he spoke and that he was clearly competent to give the testimony which he gave. 
Id.
      Other jurisdictions have found the scientific technique of blood spatter analysis to be
reliable although with no hearing outside the presence of the jury, less than extensive testimony
about reliability at the trial court level, or less than extensive review of the testimony at the
trial court. In State v. Moore, the defendant argued that the State failed to establish the
reliability and general acceptance of blood spatter analysis. State v. Moore, 458 N.W.2d 90,
96 (Minn. 1990). At trial, the expert gave the following explanation of blood spatter analysis:
During blood[-]splattering interpretation we look at the actual droplets of blood that
have been shed on a crime scene. 
 
Blood has characteristics that abide by the law of physics when blood is shed, whether
it is from a stabbing, bludgeon or gunshot wound. 
 
When a drop of blood is shed it undergoes certain patterns. If it is dropped straight
up and down and lands on a surface, it will leave a perfectly round pattern. 
 
As the angle increases the blood splatter or droplets of blood as they strike something
will become longer or narrower. 
 
There is a mathematical correlation between the length and the width of these blood
splatters that can be measured. We can then determine what angle they came in at and
by using a set of strings and thumbtacks and large protractor we are able to
reconstruct the scenes of crimes many times and actually place people where they
were at the time they were injured * * * or shot. 
  
...[B]lood splatter interpretation [is] a generally accepted technique within the
scientific community. 

Id. at 97. Relying, in part, on the testimony of the witness and the fact that other jurisdictions
had not required a substantial foundation to be laid, the Minnesota Supreme Court held that the 
State sufficiently established that blood spatter analysis is generally accepted in the scientific as
well as judicial community. Id. at 98.
      In Hampton v. State, the defendant complained on appeal that the trial court improperly
allowed expert testimony on blood spatter analysis because, he contended, it is not generally
recognized as reliable. Hampton v. State, 588 N.E.2d 555, 557 (Ind. Ct. App. [1st Dist.]
1992). The witness testified:
...blood is different from other liquids in that it consists of cells and has strong
molecular bonds. As a result, when blood hits an object, it will show a definite
directionality. If the blood hits at a 90 degree angle, it will show a circular spot; but
if it hits at an angle different from 90 degrees, it will "tail" in the direction the blood
is moving. 
 
Blood spatter analysis may be reduced to common, fundamental sciences, such as
mathematics, chemistry, and physics. Because of its physical properties, blood which
has been put in motion reacts in a certain, predictable manner when it hits a surface. 

Id. at 558. The Court concluded that the evidence was shown to be sufficiently reliable. 
Relying on Hampton, the Indiana Supreme Court came to the same conclusion. James v.
State, 613 N.E.2d 15, 22 (Ind. 1993).
      In State v. Knox, the defendant asserted on appeal that blood spatter analysis is not an
admissible area of expertise and that the State failed to lay a proper foundation to establish its
reliability. State v. Knox, 459 N.E.2d 1077, 1080 (Ill. App. 3rd Dist. 1984). Because an
Illinois court had not yet taken judicial notice of the reliability of blood spatter analysis, the
State was required to show that the evidence was based on a well-recognized scientific
principle or technique. Id. Based on the witness’s testimony, the appellate court determined
that the evidence was not of such a complex nature as to require a more detailed foundation
than what was provided. Id. at 1081. The court then held that the trial court was provided
sufficient information to make an informed decision regarding the reliability of the blood
spatter analysis. Id. Three years later, a different appellate court, finding that no Illinois court
had taken judicial notice of the reliability of blood spatter analysis, determined that the State
provided insufficient evidence of scientific reliability. State v. Owen, 508 N.E.2d 1088, 1094
(Ill. App. 4th Dist. 1987) (“The evidence regarding the scientific reliability of Knight’s blood-spatter testimony fell far short of that presented in Knox, the sole Illinois case in which
evidence of blood-spatter analysis has been held admissible.”).
      An appellate court in Ohio found that the reliability of blood spatter analysis was
sufficiently established by the expert witness. See State v. Diel, No. 11-062, 1986 Ohio App.
Lexis 8575 *48 (11th Dist. September 30, 1986)(not designated for publication). After
testifying to her qualifications, the expert witness testified on voir dire that blood spatter
analysis was taught in a forensic biology class which she attended at Ohio University. Id. at
*46. The court found that the voir dire examination also revealed recognized authorities in
blood spatter analysis and publications on the subject. Id. “The very fact that there are
publications, seminars, and recognized experts in the field of bloodstain pattern analysis
indicates its reliability, in general.” Id. The court also used the Hall opinion from Iowa as
additional support for its determination that reliability was sufficiently established. Id. (citing
State v. Hall, 297 N.W.2d 80 (Iowa 1980).
      Still, other jurisdictions have taken judicial notice of the field’s reliability without noting
any kind of hearing at the trial court. The Alabama Court of Criminal Appeals observed that
the Lewis court took judicial notice of the “general acceptance” of blood spatter analysis. 
Robinson v. State, 574 So.2d 910, 918 (Ala. Crim. App. 1990)(citing Lewis v. State, 737
S.W.2d 857, 860 (Tex. App.—Houston [1st Dist. 1987, pet. ref’d)). The Court also observed
that other jurisdictions, without a discussion of the general scientific acceptance test, have held
blood spatter analysis to be admissible. Id. The court concluded, “...whichever approach is
taken, testimony concerning blood spatter interpretation is admissible.” Id.
      The Supreme Court of Idaho granted a defendant’s petition for review primarily to
consider the admissibility of the interpretation of blood spatter evidence. Idaho v. Rodgers,
812 P.2d 1208, 1210 (Idaho 1991). The Court noted that “[b]lood spatter analysis is clearly a
well-recognized discipline, based upon the laws of physics, which undoubtedly assisted the
jurors in understanding what occurred the night [the victim] was murdered.” Id. at 1212. 
Relying on specific cases, the Court then held that “[g]iven the widespread acceptance of this
evidence by other courts, and the fact that Rule 702 favors admissibility of expert testimony,
we uphold the trial court’s discretionary decision to admit blood spatter evidence.” Id.
      Recently, the Virginia Supreme Court re-examined the admissibility of blood spatter
analysis. See Smith v. Commonwealth, 576 S.E.2d 465 (Virginia 2003). It observed that the
Court had previously held blood spatter analysis to be admissible and had rejected a contention
that blood spatter analysis was not reliable. Id. at 467 (citing Compton v. Commonwealth, 250
S.E.2d 749, 756 (Va. 1979) and Stewart v. Commonwealth, 427 S.E.2d 394, 406 (Va. 1993)). 
The Court remarked that many of the specific physical elements of blood spatter analysis are
capable of being tested using the laws of physics and chemistry, and by employing principles
of gravity, inertia, and viscosity. Id. In accordance with other jurisdictions, the Court
adhered to the view that blood spatter analysis can form a basis for admissible proof and held
that the trial court did not err in determining blood spatter analysis was a reliable science. Id.
      As late as 1995, the admissibility of blood spatter analysis was one of first impression for
the State of Michigan. People v. Michigan, 530 N.W.2d 497, 500 (Mich. App. 1995). After
reviewing case law from other jurisdictions, the Michigan court concluded:
In our view, the scientific principles underlying the interpretation of bloodstains are
neither novel nor untested. Rather, this evidence is based upon established principles
of physics, biology, chemistry, and mathematics. Given the overall recognition of
this technique in other jurisdictions, we hold that the trial courts may take judicial
notice of the general acceptance of such evidence by the scientific community.

Id. at 501.
      In State v. Roberts, the Washington Supreme Court analyzed the admissibility of blood
spatter testimony under Frye


 and its “ER 702.” State v. Roberts, 14 P.3d 713, 740-741
(Wash. 2000). The Court found that blood spatter analysis “hardly” qualified as a novel
scientific technique. Id. at 740. The Court also reviewed opinions from other jurisdictions
and discovered that many had held blood spatter analysis either met the Frye standard or did
not implicate it at all. The Washington Court then concluded, “Blood splatter testimony is not
a new method of scientific proof and, therefore, need not be subjected to the Frye analysis.” 
Id. at 741. Under its rule 702, the Court noted that blood spatter testimony had been admitted
by other jurisdictions under similar rules of evidence and concluded the expert’s testimony was
admissible. Id.
      In New York, relying on case law from within the State and from other jurisdictions, two
appellate courts found blood spatter analysis evidence to be scientifically reliable. People v.
Whitaker, 289 A.D.2d 84 (N.Y. App. Div. 1st Dept. 2001); People v. Barnes, 267 A.D.2d
1020 (N.Y. App. Div. 4th Dept. 1999).
            Unreliable?
      Have any courts held blood spatter analysis to be invalid? The short answer is no. As
noted earlier, the El Paso Court skipped the reliability question and held the admission of the
testimony was harmless. Franco v. State, 25 S.W.3d 26 (Tex. App.—El Paso 2000, pet.
ref’d). An Illinois court of appeals held blood spatter analysis to be inadmissible only because
the State did not prove reliability. State v. Owen, 508 N.E.2d 1088, 1094 (Ill. App. 4th Dist.
1987). And in Maine, the expert testified that he could determine the order of the gunshots by
analyzing blood spatters. State v. Philbrick, 436 A.2d 844 (Me. 1981). Because the trial court
held no hearing and had no evidence before it at all to demonstrate the field’s reliability, the
Supreme Court held that the trial court erred in admitting the specific testimony. Id. at 861. 
The Supreme Court did not conduct a comprehensive review or go out and look for any
support of the reliability of blood spatter analysis from other jurisdictions.
      None of these courts held that, after an extensive hearing, blood spatter analysis was
unreliable. The courts either avoided the question or had nothing in the record before them to
make a determination.
            (3) Prior Determination of Reliability
      Under the third alternative manner by which we may take judicial notice of a scientific
theory or technique's validity or reliability, when it has been shown so convincingly before a
fact-finder that an appellate court can conclude the matter should be judicially noticed, the
appellate court can decree that the matter will henceforth be the subject of judicial notice. 
Hernandez v. State, 116 S.W.3d 26, 37 (Tex. Crim. App. 2003)(Keller, P.J., concurring). In
such instances, judicial notice of the reliability of the scientific theory or technique can then be
taken by trial and appellate courts within the decreeing court's jurisdiction in future cases in
which the issue arises. Id.
      Lewis appears to be the case on point under this category of judicial notice. However, this
Court is not within the First Court’s jurisdiction. Thus, under this alternative, we cannot rely
on Lewis as a prior determination of the reliability of blood spatter analysis. 
      Conclusion
      Under either the majority’s analysis in Hernandez for judicial notice or the second
alternative method for taking judicial notice delineated by Presiding Judge Keller in her
concurring opinion, we take judicial notice of the validity of blood spatter analysis and hold
that the State was not required, and will not be required in the future, to produce evidence on
the first two criteria of Kelly.
Third Criteria
      But what about Kelly’s third criteria–whether the technique was properly applied on the
occasion in question? As was stated earlier, Holmes did not ultimately contest this criteria,
and we will not review it. We note that it is necessarily a case specific inquiry.
Conclusion
      Because we take judicial notice of the validity of blood spatter analysis and the State
proved the proper application of blood spatter analysis, the trial court did not err in admitting
January’s testimony. Holmes’s issue regarding this is overruled.
Prior Drug Use
      Lastly, Holmes contends the trial court erred in admitting evidence of Holmes’s prior drug
use under the theory that Holmes had opened the door to such evidence. He further contends
that the State initially raised the issue which Holmes later attempted to explain during cross-examination.
      Leroy Hughes testified that Holmes had been to a rehabilitation center to “get off drugs.” 
Holmes objected to the reference to an extraneous bad act of previously being on drugs. The
State contends that Holmes has not preserved his complaint for appeal because he allowed
similar evidence to be admitted later. We agree. On re-direct examination, Hughes agreed
that he had previously testified that Holmes was in rehabilitation because of a drug addiction. 
When asked about the kind of drugs Holmes was addicted to, Hughes responded, “Crack.” 
No objection was made to this testimony.
      To preserve a complaint for appellate review, the objecting party must continue to object
each time the objectionable evidence is offered. Fuentes v. State, 991 S.W.2d 267, 273 (Tex.
Crim. App. 1999); Desselles v. State, 934 S.W.2d 874, 876-877 (Tex. App.—Waco 1996, no
pet.). Because Holmes did not object to Hughes’s second reference to drugs, Holmes has not
preserved his complaint for our review. This issue is overruled.
 

Conclusion
      Having overruled each issue on appeal, we affirm the judgment of the trial court.
 
                                                                   TOM GRAY
                                                                   Chief Justice

Before Chief Justice Gray,
      Justice Vance, and
      Justice Reyna



      (Justice Vance concurring)
Affirmed
Opinion delivered and filed March 24, 2004
Publish
[CRPM]